I would like to reserve about five minutes of time for rebuttal. I would like to take the first two arguments that are interrelated, and those are the counsel arguments. The one argument or the one claim is that counsel for Robinson at trial and sentencing labored under an actual conflict of interest. And the factual underpinnings of that claim are, of course, prior to trial, Robinson's attorney stood up in front of the judge and claimed that he had a conflict of interest. And so the other one you don't, right? Yes, that's correct. The claim was raised in State court when the counsel got up and said that he had represented Mathers and that he currently represented Robinson. He had talked to both. He had gotten statements from both. He had discussed the case. The trial judge asked him whether he wanted to, who he wanted to withdraw from representing, and the counsel said that he had no preference. And so he represented Robinson. That was very prejudicial to Robinson because it prevented the lawyer from going to trial. The procedural problem I'm alluding to is procedural bar problems. Well, and with respect to that, Your Honor, let me just say this. I think there are a number of things that the Arizona Supreme Court did and that the exceptions to procedural default would apply. First of all, fundamental error preserved that claim, in my view, for Federal Review. But does our case law support that argument? What case in the Ninth Circuit says that the Arizona Fundamental Error Review preserves procedurally defaulted claims? Well, I know the State cited Poland, and I know the State cited Mormon, which is a newer case. I read those cases, and neither one of them dealt directly with the issue at hand, whether fundamental error preserves a violation of the right to counsel. And I see that. Do you have a case that does deal directly with that issue and supports your argument that Fundamental Error Review preserves the claim? Yes. Okay. What is that case? Well, that case, there are a number of cases, Judge. I don't have. Give me your best one. State v. Espinoza. And is that a Ninth Circuit case? That's a State case. No, I'm asking you for a Ninth Circuit. I don't have a case. A Ninth Circuit, okay. All right. But I think that Poland and Mormon are not as strong as perhaps a State would like them to be simply because of this. The State reviews for fundamental error, and what is more fundamental than the right to counsel? The State has said that fundamental error, State court has said fundamental error is error that takes away an essential right, one that cannot be said that the defendant received a fair trial. Certainly, the defendant did not receive a fair trial because of the conflict, because his attorney was handcuffed in going after Mathers. And that would have been crucial because he could have argued that there was no cruelty or that he could have argued that he could have taken action because Mathers acted on his own, and he could have argued that the- Well, my understanding is that a lawyer does not have a duty of loyalty to an ex-client. He does have a duty not to reveal confidences. Am I wrong about that? Well, I think he – I think the duty of loyalty would subsume the duty not to reveal confidences. Is there any indication here that there were any confidences? My understanding is that the presentation that was made to the trial court was that – was not that Mathers had given him – either of them had given him confidences, but that there was some State report that indicated that there might be some conflict between them. Well, I would submit, Judge, that the confidences were inherent in the discussion that Robinson's attorney had with Mathers. Well, that suggests he even had a conversation with Mathers, which we don't even know. Well, no. I think on the record, the attorney said that he had spoken both to Mathers and to Robinson, that they made inculpatory statements. And I think they, under the facts of the case, one would – one could assume that they implicated each other. But- I thought he referred to a State report in which they made inculpatory statements, but not that he spoke to them. Where does it say that he spoke to them? On – well, in the record in which the hearing took place. And that was approximately 42 days after the indictment. It's in the materials, Judge. But he definitely told the State court that he could not represent both individuals, that he discussed the police reports – Judge, I think that's what you're referring to – and those police reports were the sum and substance of the case against Mathers and Robinson. There were statements made, I believe, by both Robinson and Mathers within those police reports. But nevertheless, I think it's crucial, Judge, to – and I think my point is well taken, that when the attorney talked to Mathers, he received confidential communications. I mean, I don't think there's any other way to look at that, because they discussed the case. But we don't even know – we don't know that, do we? I mean, it is – would not be entirely unusual for a lawyer to be officially the lawyer for somebody for 42 days and not actually have talked to the person. Well, but in this case, he said he did. Okay. I need to find that. Okay. And the other thing, too, is if you look at Holloway v. Arkansas, the Supreme Court said, you know, it's so difficult to determine whether prejudice occurred because it's not what the lawyer did, it's what the lawyer didn't do. And so this lawyer, I think, was handcuffed in his representation of Robinson both at trial and on – and at sentencing simply because he couldn't go after him. And that was right – that issue was right for a good trial attorney to go after Mathers on that. And explain to me exactly why he couldn't go after him. Well, because he had talked to Mathers. And? And Mathers made incriminating statements. Mathers was charged – Well, let's assume those two things are true. So? So Mathers made – He couldn't use the incriminating statements, but why couldn't he go after Mathers? Because of his duty of loyalty. He could not go after him. Does he have a duty of loyalty? Yes. Why? I submit because under the – under Strickland v. Washington, the Court, Justice O'Connor said that the basic duty of a lawyer is a duty of loyalty to his client. To his client. But he isn't his client anymore. He's his ex-client. But he was. And he can't – under – under the rules of privilege, he cannot reveal. That's true. But with regard to privilege, that's a different question. Well, but it's – it's assumed within the Sixth Amendment because Justice O'Connor said that the duty of loyalty is a bedrock duty. And I think, Judge, I understand your concerns, but I think on the record and the Anyway, could we go on to either the other ineffectiveness and also I particularly want to hear about the aggravators, both of them. And let me talk about IAC. Okay. It is clear, both from the opinion of the Arizona Supreme Court and from the record, that the defense lawyer did nothing to investigate mitigation. He had 22 days between the verdict of guilt and between the sentencing. And in those – in those instances, he did nothing to investigate. And that was laid out very clearly in the petition for post-conviction relief. The counsel for post – on post-conviction obtained a psychological profile, and that psychological profile was very similar to that in Wiggins and Williams v. Taylor. In fact, I think on Wiggins, it's almost a carbon copy, because what you had as mitigation was very, very compelling nonstatutory mitigating circumstances. All right. Let's assume it's true. He did nothing. It's plain he did nothing. And he – and he – his reason for doing nothing was supposedly that Robinson didn't tell him anything, but that doesn't seem to be a reason under the case law. So let's assume that's true. Okay. Now we have this other factor here, though, which is that the sentencing judge did hear all the stuff in the post-conviction hearing. Well – So the question is, what do we – and he said it wouldn't have made a difference. Well, because I don't think he considered the mitigation as he was supposed to do. In fact, in my reweighing argument, I argue that the Arizona Supreme Court did not do what Clemens v. Mississippi says a court has to do, and that is, is to consider the mitigation in detail and to consider how that would have affected the sentencing calculus and the sentencing decision. Now, don't forget – By the way, is the same judge still sitting? Would this case go back to him again? No. I think he retired. But it – I lost my train of thought. I'm sorry. It – You were saying that he did – he didn't do the mitigation properly. Correct. And he also – the sentencing calculus was very dramatically skewed in Robinson's favor because of the striking down of the F-5 aggravating circumstance. So now you had two. Two of them were very wobbly, in my view. First of all, the cruel, heinous, and depraved was essentially not there because under Arizona law, you have to show that the defendant intended cruelty. He's a non-participating accomplice. State v. Carlson is the case. State v. Carlson relied on earlier Arizona cases that are cited in my brief. There was no evidence that Robinson intended that this woman would suffer undue cruelty, as is required to be shown under Arizona law. In fact, the State's theory of the case was that Robinson wasn't there to commit murder. Robinson was there defined as ex-wife. They introduced three very damaging pieces of evidence that made out their motive. And the motive was, according to the State, that Robinson was there to find his ex-wife, just like he had done when he found her in North Hollywood and burst into the – two individuals burst into the scene with guns. They held the people at bay, and Robinson came in and talked with them. So just to get the structure of the case. Yes. It seems to me, then, what you're saying, and I think this is probably right, that in order to meet a Strickland standard on the mitigation ineffectiveness, we have to probably strike down at least one of the aggravators. Because the aggravator that was already struck down was struck down before the judge said it would have made a difference to him. So we already knew that that aggravator was struck down. But if we struck down one of the other aggravators, then we'd have a situation where he wasn't comparing apples and apples and we couldn't rely on his state. I think that's correct. But – and I said in my brief, and I think it's black-letter law in this circuit, this is de novo review. This is a pre-AEDPA case. The Court is not bound by what the State court said it did or didn't do. You make your own decision based on that. And I think the only decision you could make is that there was, in fact, ineffective assistance and Robinson was prejudiced and there was a reasonable probability that he was. But only if we then strike down one of the aggravators. I don't think so, Judge, because I think you have to make the sentencing calculus and under a reasonable probability standard, which is not you don't have to strike it down, you just have to find that there was a chance, a probability that's reasonable and based on the record, which it is in this case, to determine that prejudice occurred. And I think prejudice did occur here. Counsel, may I ask you why the – your arguments on the aggravators are not all defaulted? And could you go through each one of them separately? On the aggravators? On the aggravators. Aggregators. All right. If I – could I talk about the cruel heinous, the depraved aggravator first? I think – I see them as all disjunctive. The cruelty, the depraved, and then the heinous. Right. Well, with respect to those, at the – at the sentencing, the State introduced a hearsay statement of Defendant Washington in which he described what Robinson was doing and the purpose of the crime. And the Supreme Court of Arizona found that that violated Robinson's confrontation rights. So that evidence was out. Without that evidence, I don't think there is any evidence to support the cruel heinous and depraved. I'm talking about – okay, let's talk about the cruelty. Right. Well, the cruelty aspect is this, is that a victim has to suffer more than just what is – what would happen in a murder. And Arizona case law is clear that it has to be more – it has to be very substantial suffering. I understand that. I'm talking about when was the – the cruelty, was it procedurally barred? Was that raised in the State court in the specific way that it's being raised now? Well, the district court found that it wasn't. He said that we recast our argument. My argument to the court today is that we didn't because the trial attorney and the sentencing attorney, they're the same guy, said that there was insufficient evidence to find cruel heinous and depraved. Why? The basis for saying there was no cruelty before was that – was what? That she didn't – she wasn't conscious? Is that what you're saying? That was part of it. Based on the facts of the murder, that they were more in line with cases like Brookover and Walton, which had some very, very, I would say, strong evidence of cruelty that the Arizona Supreme Court said wasn't enough. But the other thing when – But isn't that a different argument than whether or not the defendant intended for her to suffer, which is the argument you're making now? No, I don't think so, Your Honor, and here's why. When the lawyer said insufficient evidence, that is a – a tent, if you will, on the cruelty, heinous – cruelty circumstance, because an aggravating circumstance is an element. Satizan v. Pennsylvania said that. It's an element of capital murder. It has to be proved beyond a reasonable doubt. And it has to be – it's defined by the Arizona Supreme Court's construction of that aggravating circumstance. And I think it's Stringer v. Black that said the court has to narrow those aggravators, Ake v. Oklahoma and – and other cases like that. So what you had when he said insufficient evidence, insufficient evidence to find the aggravator under law. No, he didn't just say insufficient evidence. I'm sorry. He didn't just say insufficient evidence. It was insufficient evidence that she was conscious at the time. Well, and that would be part of – of the argument that there was insufficient evidence of cruelty. Now, maybe he didn't set out all of the evidentiary underpinnings of that, but he said enough because he said insufficient evidence. Sotomayor, did the trial court say on both the first and second post-conviction hearings or decisions that the issue had been raised and decided? Because when they tried to raise it the second time, he didn't say you can't raise it now because it's too late. He sort of seemed to say that at one point, but later on, he said it's been raised and decided. I think that's correct, if my memory serves. It was quite specific at that point. Yes. But what has been raised and decided? What specific point had been raised and decided? That the cruelty aggravator was not proved. Right. Because of the transfer of intent. At that point, it was clear that that was the issue. Yes. Well, where is that in the record? I'd like to see that. Where is that in the record that the court said specifically that the cruelty issue was tied to the intent of the defendant? In the Arizona Supreme Court, in their opinion, they said that the cruelty factor was found. So they rejected on the merits the insufficient evidence argument. I believe in the State PCR record, they attempted to argue that again. And this is my recollection. They attempted to argue it again, and the judge said the Supreme Court has already found that. Right. But I don't disagree that there was a finding made that a cruelty argument had been raised, but the specific issue regarding the defendant's intent vis-a-vis the cruelty aspect, where is that found to have been exhausted? To be honest with you, Judge, I don't think it is in the record. But I don't think it has to be. Because when you – first of all, Judge, I mean, when I come into a court and say they didn't prove their case, well, they didn't prove the elements of their case. They didn't prove the facts of the case. They didn't prove by evidence that there was proof beyond a reasonable doubt. They didn't prove the definition of the crime, the three or four elements, the fact and the mental state. So I think, Judge, really what the district court did was – I think he was wrong when he said we recast our argument. But I think on the facts and the law, that's incorrect simply because when you say you didn't prove a burglary, you didn't prove a murder, you didn't prove a certain crime, well, you're talking about everything. Okay. Is your argument the same for depravity and heinous justice? Yes. Okay. All right. All right. Now, I have – I've gone 23 minutes. I can talk about the reweighing or I can talk about the other aggravating circumstance in two minutes. Let me ask you something. Again, to me, the overall structure is important. If we were to – let's suppose we struck down – there's another aggravator, too, that you're also attacking, which is the pecuniary motive one. Correct. And there are procedural bar problems with respect to that. All right. But let's suppose we struck down one or the other of the aggravators. Right. What would we do then? Do we reweigh? Do we send it to the court to reweigh? Do we reverse the penalty for a new penalty hearing? What do we do? I think you can reweigh yourself and say there wasn't sufficient. Is there any precedent for that? I can't remember. I really don't remember. And I didn't – I looked. I don't think there is. But it's perhaps an open question. Well, it could be an open question. And I didn't anticipate that question coming, so I didn't brief that issue. But certainly you can remand to the State court for a new sentencing. Sentencing for reweighing. Could they reweigh at that point? Well, they would have to. Well, would they? Or could they simply have a new hearing and start over again? Right. Which one? Do we send it back to the State appellate court to reweigh as they would have done if they struck down the aggravator themselves? Or do we send it back with directions to hold a new sentencing hearing? I think you send it back with directions. To do what? To do – to conduct a new sentencing hearing. Because here's why. If you strike an aggravating circumstance, everything's up for grabs again. But if they had struck the aggravating circumstance, they would have simply reweighed themselves. They wouldn't have had a new hearing. They didn't reweigh. I'm sorry? But that would give them the opportunity to reweigh. That's right. And they didn't. I think there's another issue. I'm sorry, Judge. I'm sorry. If we were to find that the counsel was incompetent in not finding proper mitigation, even though it's been heard once by the district – by the State court, I think maybe you say start over, have a new hearing, and there could be additional evidence possibly. Well, I think you'd have to. And there could be additional evidence. And, you know, the other thing, too, there'd be a jury trial. I'm sorry? There'd be a jury trial. Under Ring. Right. That presupposes that there is no prejudice – that there is a finding of prejudice as well. In view of the fact that the sentencing court said that it would not have made a difference. Well, because this court can determine. You're not bound by what the State court says. And I – again, I don't think the judge carefully considered – Well, frankly, if we didn't strike down an aggravator, I would have a very hard time seeing how there could be prejudice. I mean, this judge did see all of the evidence, and he did say that he considered it all. And you might not be happy with how he considered it all, but he said he considered it all. And it would seem very difficult. On the other hand, as I say, if we struck down an aggravator, then we don't have the same thing before him that he started with. That's correct. And I think you have to strike the aggravators. Not just an aggravator, but I say you have to strike both aggravators and make the State come in and prove them again, because they proved it on inadmissible evidence. You can't take that inadmissible evidence out and then say, well, here's what the court would have done, and that's enough. Well, on habeas, evidentiary rulings on a basis for habeas relief. Well, but a stricken aggravating circumstance and a finding of prejudice under IAC certainly are. The evidence that you're talking about is, however, it was constitutionally stricken, right? It was evidence. Yes. It was stricken for constitutional reason. Yes, under the Confrontation Clause. And not only that, it was specifically not admitted against Robinson. That's the point I didn't understand. It was specifically not admitted against Robinson, but then it was relied on anyway. You know, Judge, it's been a long time since I've reviewed that. My recollection is, is that Washington and Robinson had the same hearing at the same time. Washington's statement came in. And I think that it came in specifically. I mean, I read it last night. Specifically not against Robinson. Well, I don't, you know, Judge, I'm, I don't think that's the conclusion. Is that an issue in this case? The admission of, is there an issue in this case regarding what evidence was admitted? The issue is, is that the State supreme court struck Washington's statement. And that was the basis for the. And struck the aggravator. That's correct. Exactly. So that's a foregone conclusion. But if we're talking about what to do and a remand, that's why you'd have to have a new sentencing. Because you can't, you can't remove that evidence from the sentence. That was already stricken at the time the judge said that he would have done the same thing. So he knew at that point that that aggravator was out and that that evidence was out. Well, then we're back to what would you do if you struck one or more aggravators? Let me ask you to address the issue of whether the lesser included offense failure to give that instruction is before us or is it procedurally barred. Well, I would again go back to the fundamental error and the miscarriage of justice and the cause and prejudice. I think that preserved it for review. And I know the Court is going to make a determination of that with respect to the actual conflict issue and what fundamental error review really does. We don't know whether the jury convicted on felony murder or first degree murder with premeditation because you didn't get a, you asked for a separate verdict form and it didn't get it. Right. Well, and I think that's a crucial error. I think that if the State proceeds, in Arizona they can proceed under felony murder or premeditated murder. And it seems like they had a blend. Was that issue raised on appeal? It seems like we're ranging pretty far from the issues. Judge Berzon just shook her head. I'm going to go with the issue here. What I asked was, counsel, was whether it was procedurally barred. Right. Okay. Okay. And this, what wasn't raised in appeal was the question. Yeah, the question was, was it raised on this appeal? I mean, what was raised in appeal was the lesser included offense, but what wasn't Now, I'm out of time, but if the Court wants to give me more time. Okay. Why don't you reserve your time and you can come back later. Thank you. Thank you very much. May it please the Court. My name is Jeff Zick. I'm an assistant attorney general with the Arizona Attorney General's Office. I represent the appellee in this case. I'm going to have to tell you also, speak up. I will. I will try to do that. With respect to an issue that came up during counsel's argument, with respect to the aggravating factor, the F-6 cruelty aggravating factor, and whether that was actually raised, the transferred intent issue, in the August 9, 1999, district court order, the district court judge indicated that Robinson did argue that issue in a subsequent or successive petition for post-conviction relief, that it was denied and procedurally barred or precluded under Arizona Rule 32, Arizona Rule of Criminal Procedure. However, Robinson never raised that issue with the Arizona Supreme Court. In the August 1994 order, he said under the heading, Cruel heinous or deprived conduct and the doctrine of transferred intent. He says, was revisited in briefs. Nothing has been presented here except a reiteration of the sentencing proceedings and findings of this Court, which were later reviewed and upheld on appeal. So he seems to be saying that he did understand that the doctrine of transferred intent was before him the first time and was decided the first time. Well, I think there could be different interpretations to what he said. It was the same argument, he says, in that order that was raised before, but transferred intent was not raised before. It wasn't raised in the direct appeal. Are you saying it was? Well, in the direct appeal, he says that he wasn't there. He said two things. He wasn't there and it wasn't his acts. He did say that in the direct appeal. He did. I've got it right here. I said he did. Yes. I'm sorry. He did say that. But the gravamen of his claim on direct appeal was that the victim did not suffer cruelty. That's what he argued. If he presented the facts, I wasn't there. He presented the general legal issue, insufficient evidence. Under our case law, isn't that sufficient? I think if you look at Nevis v. Sumner and other cases that deal with the idea that issues must be fairly presented to the State's highest court before you receive Federal review in habeas, I don't believe that would be enough to make that argument. And then we have the trial court saying later, and you really haven't responded to me on that, that it was raised before. If he's saying in August 1994, in the first, first post-conviction review, that it was raised on the direct appeal, that's what he's saying. I don't know how to respond to that. Is he not saying that? You're saying he's not saying that? No. If that's what he says in his post-conviction order, I can't quibble with that. What I can say is when you look at Appellant's opening brief on direct appeal, that issue was not raised. He did not argue transferred intent or that he did not have the intent to cause suffering in any of the victims. But when he says he wasn't there, isn't that implicit? I don't think that's specific enough under the case law to fairly present that issue. Do you think he didn't raise it with respect to either prong of either the heinous or depravity, either or just on cruelty? No. I don't think he raised it with either of the prongs of the F-6 aggravator in his direct appeal. Now, if you even do that. Didn't the Supreme Court address it with respect to the heinous and depraved? I don't believe they addressed transferred intent. And they certainly didn't look at State v. Carlson, because Carlson had not been decided yet. That's about the cruelty. But I thought on the heinous and depraved, they actually addressed it. I'm not sure about that, though. And I'm not sure about that, either. My recollection is that they did not address the issue of transferred intent with any of the aggravating factors. Now, they did do an Edmund Tyson finding, and maybe that is what you're considering as transferred intent. But that issue was not raised before the Arizona Supreme Court. In a successive petition for post-conviction relief, he did raise that issue. But he did not raise it in his petition for review when he petitioned the Arizona Supreme Court on that particular issue. Well, let's talk about whether there was sufficient evidence of cruelty. Exactly what's the evidence there? That's assuming that you get beyond the procedural bar. Yes. The evidence of cruelty is this. There's no doubt from the record that Robinson planned this crime. No. But I'm going to move forward from that. That's really not the question that I'm asking. What would constitute cruelty? The woman was shot. She was shot. What constitutes cruelty, and Arizona's case law is quite clear on this, mental anguish can cause cruelty. It says mental anguish or physical abuse. Those two. Yeah. Right. And in this case, what you have are you have two armed strangers bursting into the home of two elderly individuals and rousing them from bed at gunpoint, tying them up, forcing them to lay down on the floor. There is no doubt, based on the facts that were presented at trial, that the victim suffered mental anguish at that point. There is also testimony from Ralph Hill, the surviving victim, that when they were laying on the floor bound, he heard his wife, the victim that died, indicate or tell the two intruders that she wanted her feet covered up. At that point, Ralph Hill testified that he blacked out, most likely from the gunshot that he received to the back. So there's clear evidence that Ralph Hill was the first one shot, and there's evidence indicating that Sterling Hill, the victim that died, saw that. I've tried to look at the cases where they have found cruelty. This one just doesn't seem to be over that bar. I would disagree with that. What cases do you have? You could go back to State v. Comer to look at cruelty. Newell might have, State v. Newell might have dealt with cruelty. I'm trying to think off the top of my head. There are so many cases that deal with cruelty. Yes, I know. And particularly deal with the mental anguish aspect of cruelty. And in this case, it's quite clear that the victim did suffer mental anguish. And that mental anguish can start from the point when the two armed intruders entered the home and roused her from bed and tied her and her husband together. But the problem, of course, is that we have nothing connecting Robinson. After you take out the Washington statements, that although the trial court found, for example, that the defendant planned to execute the victim during the robbery, that plainly is without any evidence. Well, I think you can look to the Arizona Supreme Court decision on this case and what it indicated was the evidence to show cruelty. Not only the mental anguish that happened inside the house, but what was connecting Robinson was the fact that he actually planned this particular crime. He procured the weapons for this crime. Okay. He put the weapons in the car. He procured the transportation. But he didn't, the particular things that have to do with the cruelty, he wasn't even there for, i.e., the order in which they were. There's no evidence that he ordered them to shoot anybody. There's certainly no evidence that he ordered them to shoot anybody in any particular order or any particular manner. So how could there be, how could he have intended cruelty? I think if you look at the evidence in the case, you can infer from the fact that he gave guns to these two, to his two accomplices, that he transported them to Yuma for the sole purpose. I mean, I think he would do a lot better, frankly, to just agree, because it seems plain to me that there's just, if there's a, if the intent issue is in the case, there's simply no way that he could have, there's no evidence. Well, I think if you look and if you're relying on State v. Carlson and the argument made by appellant in this case, State v. Carlson dealt with a situation that was somewhat similar to this. But it said that, and it dealt with cruelty, didn't deal with the heinousness and depravity, because heinousness and depravity deal with the state of mind of the perpetrator, and cruelty deals with the state of mind of the victim. But what Carlson said, what the Court in Carlson said was vicarious liability doesn't play out for cruelty unless there was an intent to cause suffering or the victim suffering. Now, counsel, wasn't there evidence in the record that the cohorts were told if they had any trouble to shoot the people? Well, that was, that was part of the statement that I believe was stricken. Was stricken. Okay. Yes. That's the problem. I mean, there is actually, after that statement is stricken, there seems to me to be nothing, and you can tell me if I'm wrong, nothing. I wanted also for you to consider the evidence that the State put in was that he had gone to Philadelphia, he'd gone to Hollywood, and he'd taken gunmen to go in. And his purpose was not for them to kill, but to secure the place and let him steal his wife back or his common-law wife back. And isn't this just a continuation of that kind of a plot? Well, I think that the evidence in the case certainly showed that there was that type of motive and that type of modus operandi that was occurring in this case. It was a whole case for the State, really, at the time. Well, that was one theory that the State put forth in the guilt phase. But what you had was a situation where he promised payment to two accomplices to do this, and then he gave them a ruse. He, Washington and Mathers, his two accomplices, they didn't know who the Hills were. They didn't know where the Hills lived. They had no connection to the Hills. The only connection they had was through Robinson. So it really isn't an inconsistent theory when you have those two separate theories playing in this case. In fact, I'm reading the transcript of the sentencing here. I think the government explained how they fit together. So that didn't seem to me to be a problem. But the real question is, still, where is the – there is no evidence, you haven't pointed to any, indicating that he planned any murder, much less a cruel or heinous and depraved one. Counsel, was there evidence in the record that in one of the prior forays that Mr. Robinson said if the child hadn't been there, he would have killed the sister and his common-law wife? That's correct. And that was part of the evidence of the 404B, other act evidence that came in. Clearly, it showed that he had a violent nature with respect to this particular woman, Susan Hill, that he was seeking. And that played into the motive to go to Yuma. I'd like to get back to Judge Berzon's question regarding the intent. I can point to the fact that the Arizona Supreme Court found that the evidence was sufficient to show cruelty, to show heinous and depravity. When you look at State v. Carlson and indicating that there's no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering, the evidence in this case showed that Robinson planned this particular crime. The guns were procured for this crime. He transported two accomplices under a ruse that they were going to a drug dealer's house and that they could get drugs and money. Now, when you look at whether that type of plan, knowing that you're sending two individuals in with guns at 1145 at night with two elderly individuals in the home, I think it's reasonably certain that you can infer that some type of suffering is going to happen. And if you get beyond any procedural bar and look at that and look at State v. Carlson, I think that's what the evidence showed, that it was reasonably certain that he would know or should know that suffering is going to happen. But then you have the additional problem that, of course, the cruelty has to be more than would occur in an ordinary first-degree murder. So you have to demonstrate not only that he knew that there would be a first-degree murder, but that there would be a cruel or a first-degree murder so unusual as to be denominated cruel. And the evidence then gets into this detail about who was shot first and how much time there was and whether they were unconscious and so on. How could he possibly have known any of that? Well, I think you can infer from the reasonable certainty that suffering is going to occur by sending two armed individuals into a home that that is going to occur. Well, that's true if you shoot somebody, there's suffering. But that isn't good enough for the aggravator, right? I mean, this is very gory stuff, right? Actually, it's not true if you just shoot someone. That wouldn't show cruelty. You have to show some type of mental anguish. And what is there? Let's even assume that he had reason to think that they were going to get shot. Why did he have reason to think that they were going to get shot? It was mental anguish. More mental anguish than any other murder. There would be reasonable certainty to show, and I think the evidence bore this out, that intruding into a home at 1145 at night and rousing individuals from bed, even if he knew they were going to get shot, that clearly would show mental anguish or he would reasonably should know that mental anguish would happen from that. Let's talk about some of my structural issues. Let's suppose we were to strike one of the aggravators. Then what? And suppose also that if we thought that some reweighing had to be done by somebody or there had to be – would we reweigh? Would we send it to the State appellate court to reweigh? Would we send it to the State court to have a new sentencing hearing? What would we do? I don't think there's – well, I haven't found any precedent to show that this court does any reweighing. Did you look? I looked. I did, and I didn't find any. And quite honestly, I didn't really anticipate that question, but I've looked at that issue. If you find that there's a constitutional error in the structure of the sentencing, I think that the precedents clearly show that you remand this case for a resentencing. I think that that's what, without – But if the constitutional error, let's suppose, were simply – let's just suppose striking an aggravator, the State – if the State supreme court had done that, they could simply have reweighed themselves. That's correct, and they did that. Well, you can't tell. They said that there was no mitigation, so that they didn't really have to reweigh, or maybe that's a sense reweighing, I don't know, or a weighing. Well, I think they did reweigh. I think what the Arizona Supreme Court did when they struck the F-5 aggravator, and they specifically said in their decision that they went through an independent review reweighing, and they cited to Clemens in the decision. So I think they properly – They said, strangely enough, that there were no mitigations presented, and that's – you did a noble job in your brief of trying to deal with that, but it seemed to me quite clear that not only was there mitigation, some mitigation presented, but the district, the trial court on the first post-conviction hearing noted that there had been mitigation presented and said he considered mitigation. So that just seemed wrong. Then he went on and said that they found no mitigation, no mitigating factors. And even that isn't what the trial court said. He said that he did find mitigating factors. He just didn't think they worked against the aggravator. So we have the two courts kind of saying opposite things about the state of the record, and what do we do with it now? Well, I think what you can do with it is – and thank you for the compliment on the brief – but that's really what the essence of what the argument is. Clearly, there was mitigation presented at the first sentencing. I mean, arguments were made with respect to two statutory mitigating factors, and arguments were made with respect to two non-statutory mitigating factors. So when the Arizona Supreme Court says that no mitigating factors were presented, I think what they were saying, and maybe it was an inartful way of writing the decision, what they were saying was that he didn't raise any issue with respect to those issues, and that the trial court – I thought maybe they just meant that they were so insignificant that they didn't have to consider them. It's possible, but I think that they did – that they would have considered in their independent review. And this Court has said in looking at Arizona's independent review that it is a thorough independent review. So I think they did look at it, and it may have been an inartful way of phrasing that particular issue. But in the independent review, they did strike the aggravator, and they did a reweighing with respect to mitigation and the two other aggravating factors that remained. Well, the reweighing was there are no mitigators. That was their reweighing. Because under Arizona law, once there's no mitigators, there's nothing to weigh. Well, they weighed the fact that there wasn't any sufficient mitigation to outweigh the aggravating factors or that the aggravating factors were overwhelming. If there is an aggravator and there's no mitigation, death penalty. Isn't that the law? If you're asking me now whether – if a jury doesn't hear any mitigation and they hear – well, I mean, I guess we could parse out what any mitigation is, because a jury or a trier of fact under Arizona statute can consider anything in mitigation, whether it's in the guilt phase or the penalty phase. But I think, isn't it the state of the law in Arizona that if there is no mitigation and there is one aggravator, that's enough for the death penalty? In a technical sense, I would agree with that. But I think under the Arizona statute, even if a defendant does not want to present any mitigation, that a jury can consider anything in mitigation. And a jury is told that. Now, this wasn't a jury. It was a trier of fact. But even back in 1987 or 86 when this case was tried, the statute was essentially the same. Now, do you agree that if we were to send this back to the State court, there at this time would be a jury? I think Ring would dictate that or demand that a jury trial occur, a jury sentencing. So as part of this discussion we're having about the role of the aggravators, if we were to strike one aggravator and not the other, would we then have to affirm on the ground that, as Judge Fletcher suggests, and add if we did nothing with the mitigators, but although there's the Hawaii Sea issue, but suppose we did nothing with the mitigators, would we simply affirm at that point on the ground that under Arizona law, striking one aggravator doesn't change anything? Yes, unless you find something structural in the record that a constitutional error that indicates that the sentencing was, there was a violation of constitutional law, I think you would have to affirm. Striking one aggravator, there would still be an aggravator remaining. The trial judge, who sat as also the post-conviction judge, heard the additional mitigation that was presented and said it would not have made a difference. But, counsel, we don't have to agree with that because it's preed, is that right? Well, I think you have to give it some deference. That's right. But, I mean, it is an issue that we consider de novo. That's correct, because this is a preed case. Keep all our heads straight. But more than that, if he only heard, if he thought there were two aggravators and there were really only one, then it seems to me his own impression of his own mental state is not accurate anymore. That could be a question that is raised, certainly. But one aggravator would be remaining. The aggravation, the two aggravators the Arizona Supreme Court found sufficiently outweighed any mitigation. With respect to the additional mitigation that was presented, the trial judge, who sat as the post-conviction judge, heard that evidence and said it would not have made a difference. Now, there has been no development of any further mitigation since that time, and that was in 1983. So whether there's any additional information that would be presented at a resentencing, I don't know. I suppose there could be evidence about his behavior in prison. I mean, there are things that have happened in 20 years, clearly. Sure. And I believe that a jury or a trier of fact would probably give that little weight, given the fact that the crime occurred back in 1986 or 87. But certainly they would consider it and give it some weight. Are you going to address the ineffective assistance in presenting no mitigation evidence at all? I can address it. Please do. With respect to the ineffective assistance of counsel claim, at the post-conviction hearing, trial counsel testified that he spent a significant amount of time with Mr. Robinson, and he talked with Mr. Robinson regarding mitigation. Asked Mr. Robinson whether there were any witnesses that could be called on his behalf for mitigation. He talked with all — well, he testified he talked with primarily, mostly all of the witnesses that the State noticed, and that was some 50-plus witnesses. He testified that in talking and spending a significant time with Mr. Robinson, that he did not have any clue as to whether there was any mental deficiencies in Mr. Robinson. In fact, I think he testified that he did not see any mental deficiencies. He also testified that at the time that this case was tried, that the standard in capital cases was that you did not ask for appointment of mental health experts unless there was some inkling or some clue that the defendant was giving you that something may be awry. That's the same thing that happened in Strickland. If you read Strickland, counsel for Strickland — I can't remember if it was Washington or Strickland, but counsel for the defendant in that case did the same thing. His primary investigation was talking with the defendant and gathering information from that. He talked with a couple family members. He did not get a mental health examination of the defendant. He did not call any caregivers. But certainly under the more recent cases, Williams, Wiggins, et cetera, even if the defendant doesn't want the mitigation put on, there's still a duty to investigate. And certainly under our case law. So how can it be that simply talking — put the mental health issues aside for a minute, but what about just all the background information? He apparently did not find out. The psychiatrist was the first one apparently who heard the sexual abuse evidence. Whether or not the psychiatrist's opinion as to his mental health was worth anything, at least proceeding in that way, found something out that he didn't find out through casual conversation. Didn't he have some obligation to talk to someone other than Robinson about Robinson? I think the record reflects that not only in talking with Robinson, counsel did talk with family members. He did interview family members. But he interviewed the family members that were testifying against him. And apparently this was a very big family. And where you — where they got the notion that because two of the sons were testifying against him, everybody else had nothing useful to say, I don't know. There was no — he didn't ask for an investigator. That's correct. I think he testified at the post-conviction hearing that the standard back in 1986, when he was tried, was that he did not ask or counsel didn't ask for an investigator. The trial judge, I think, even in the record, he didn't testify. He made the comment that back in those days, they weren't — they didn't have investigators for appointment for capital counsel. But in 1993, when the post-conviction hearing took place, the judge said, now we do. But they didn't back in 1986. And I think it's reasonable, when you look at the trial counsel's testimony in the post-conviction hearing, he had a reason for not having an investigator. He wanted to delve into every single witness the State disclosed. He wanted to interview and find out for himself. And he didn't place himself in a position where he was going to have a conflict of interest with respect to interviewing witnesses. But I think it's reasonable for counsel not to have an investigator at that time to look at those issues. Now, he did travel to Banning, California. He did travel to Pasadena. But did he interview his whole family or any members of the family other than the people who were testifying against him? The record doesn't indicate whether there was interviews of any other family. And also, in talking to the people who were testifying against him, did he discuss mitigation evidence as opposed to what they were going to say? There's no information in the record that he did discuss mitigation. I would assume, and that's just an assumption, that when you talk, when you interview family members in this type of a situation, that you do have background information. And certainly, there's no indication. Well, his two children aren't going to know much about his childhood. And his wife probably isn't either. So what about the people who would know something about his childhood? There's no indication that those individuals were talked to. That's no indication that he tried either, is there? Not from the record. What we have is he spent a significant amount of time talking with Mr. Robinson about the case and about mitigation, and that Mr. Robinson indicated or didn't give him much of anything to work with. I think that's the way he characterized it in his testimony. Do you want to briefly address the conflict issue? And I understand there are significant procedural bar questions with it, but let's leave them aside for the moment. What about my question? Is there anything in the record that indicates that, in fact, he even talked to Mr. Mathers before? There's nothing in the record that indicates that he – well, there's nothing in the record that indicates any specific conversation with Mr. Mathers. He did say he had had a conversation. There's no doubt about that's in the record. Right. What's in the record is the fact that when he came to court and he informed the trial judge that there is a potential conflict and I need – I can't jointly represent Mathers and Robinson. What he said was, based on the disclosure from the State, which was the police reports, and statements made in the police reports, and I've gone over the – I went and went over the police reports with both Robinson and Mathers, that there is a conflict. I can't represent both. There's no indication that counsel had any confidential information from Mathers. In fact, he didn't say he had any confidential information from Mathers. Now, when you look at the actual conflict, and you can look to the United States v. Baker, the Ninth Circuit case, it talks about actual conflict. You have to have a counsel who's representing conflicting interests. That's one. And, two, that the actual conflict affected his performance at trial. They were. He was – they did have conflicting interests. At that point, they did. And when that issue arose, he immediately brought it to the trial court's attention. The trial court heard his request and properly gave Mathers separate counsel. Now, there's no duty of loyalty at that point, because there's no indication from the record that any confidential information changed – was exchanged between Mathers and trial counsel. Well, now, what if Mathers had said, look, Robinson told me to go in there and really shoot him up and take whatever steps. Now, isn't there a real conflict there? He can't really reveal that to Robinson and say, did you say that? How can we counter that? That's going to come into the evidence. It kind of ties his hands, doesn't it? That situation would, but we don't have that situation here, because there's nothing in the record indicating that counsel had any confidential conversation or information about Mathers. But he said he had a conflict. He said he had a conflict. So that implies that there was something that was said that one – one client would be benefited and one would be disadvantaged by what was said. I think what the record shows, in all due respect, is that the conflict that counsel was talking about came simply from the police department. And the report, because the report said conflicting things. That's correct. Thank you very much, counsel, and thank you for your useful argument. Counsel. Brief rebuttal. The State says that there was mitigation presented. Maybe they didn't read the opinion of the Arizona Supreme Court, which said no mitigation was presented and we find none. So that, I think, settles that issue. But they did say we find none. So then what do we do at that point? If they find – they went on to – if they hadn't said we find none, then maybe there would have been a problem. But they did say we find none. Well, you have to do something. And the something could be that there was sufficient mitigation to defeat the death penalty. Yes, but their implication is we looked at the record independently and we find no mitigation. No mitigation. Right. Now, can we question that? Yes, you can, because I've raised the IAC claim. Well, I understand that. That's a different point. But as to what was in the record at that point? There was nothing. Their opinion is that they regard that as not mitigation. They said no mitigation was presented. No mitigation. I think judge means no mitigation. And therefore? And therefore, the defendant was prejudiced at his sentencing. There was no mitigation. Oh, I see what you're saying. You're going back to the IAC issue. Right. You're saying, okay. Now, I think the State admitted that there was no reweighing in this case, and I don't know if the Court wants to hear further argument on that. Now, also, I think the State's attorney said that there – that the Court would have to remand if there was a structural error. Well, there was no adversarial testing on the mitigation-aggravation phase of the case. There was no mitigation presented. There was no investigation. And with respect to investigation, I don't think that the State – and they like to make this argument – they say, in this and other cases, well, the lawyer talked to the defendant, and the defendant had no mitigation. So, therefore, there's no need to investigate. There's no need to get a psychologist or a psychiatrist's report. Now, how would Mr. Robinson know that mitigation is crucial, and how would Mr. Robinson know that there – that the Supreme Court has said, even under Strickland they said this, that any fact in mitigation should be investigated and presented on the basis of reasonable investigation? Now, you've alluded to what the report said, and the report was – was almost Wiggins-esque. Thomas, what? Wiggins-esque.  Well, the mental health evidence as such isn't all that impressive, frankly. Well, if I may, the report – and I read the report just recently. The report indicates that he had – that he was close to being borderline mentally retarded. He had no – he had no education to speak of. And he had no education to speak of. And the testing that – that the psychologist gave showed on some of the test results that people with Robinson's makeup can be schizophrenic, they can have bipolar. He found two personality disorders, borderline personality disorder, which is a very serious mental condition. He also found adjustment disorder, which I think shows. And it also – all the mental health evidence would show that Mr. Robinson lacked judgment, that he thought that he could repeat the Hollywood incident and everything would be fine. He thought that his wife would want to come back to him after she made every attempt to flee this man. So, Judge, I have to respectfully disagree that the mental health issue was crucial and the Supreme Court is not. But there was a fair amount of information that came out about sexual abuse as a child and so on that didn't come out earlier. That's correct. In Wiggins, I think, there was sexual abuse and physical abuse in Wiggins. So the Supreme Court has indicated that, you know, that's crucial evidence. And there was no adversarial testing. Just a couple of more, if you – Give me about a minute, one minute. Okay. You know, the State says that the defense lawyer made a decision not to investigate because that was the sort of way things were done in 1987. Well, Strickland had been out for three years. If he knew about Strickland, he knew he would have to investigate. And also in the PCR evidentiary hearing, the attorney said he didn't request funds because that just wasn't done in Yuma County. And what he's implying from that is if he had made the request, he would have been denied. So he thought it was futile. And finally, Judge, with respect to the Mathers conversation, and I don't want to repeat my arguments, but Judge Fletcher has said, well, certainly there was something discussed about the murder and something discussed about Mathers' role and something discussed about Robinson's role. And the opposite conclusion could be drawn, that Mathers told the attorney that he and Washington went in on their own to rob and to kill. With respect to the cruelty faction, I think the Court needs to look at Brookover and look at Walton. Those are State court cases. Brookover, the facts were the defendant lay in wait. You need to wrap up right now. Okay. Thank you. The defendant lay in wait. The victim begged for his life. He shot him. No cruelty. Thank you very much. Thank you both very much for a useful argument and a hard case. The case of Robinson v. Schreiro is submitted. Thank you very much.
judges: B. Fletcher, Berzon, Rawlinson